Jan. 7,
 1930.

### OPINION OF THE JUSTICES.

560

On April 18, 1929, the following resolutions were adopted by the Senate.

*To the Justices of the Supreme Court:*

*Whereas* the legislature of 1927 provided for the appointment of a special commission to study the general subject of state and municipal taxation and to report to the present legislature their findings and recommendations as to the expediency of revising or amending the existing tax laws; and whereas said commission has made a report to the legislature and incorporated its recommendations in sundry bills affecting the general system of taxation which are now before the Senate; and whereas serious doubt has arisen as to the constitutionality of various provisions of these bills and it is important that the question of their constitutionality should be settled in advance of their enactment; and whereas there is not time to receive an answer to these questions before the adjournment of the present session of the legislature, now therefore be it

*Resolved,* That the president of the Senate be and hereby is directed to request the opinions of the justices of the Supreme Court upon the questions arising under these several bills now before the Senate, to wit: House Bills Nos. 5, 10, 13, 15 and 401, and particularly upon the questions enumerated below, and to request the justices to render their opinions as soon as may be convenient so that the subject matter may be acted upon at the next special or regular session of the legislature.

1. Would any constitutional provision be violated by imposing a tax, as provided in House Bill No. 13 in new draft, upon the franchises, property and estate of gas and electric utilities conducting business in this state?

2. If a tax may be imposed as provided in said bill is it rendered unconstitutional by the method of distribution proposed in said bill?

3. If question 1 be answered in the negative, is there a franchise, or any property in addition to the physical assets of such utilities, which constitutionally may be made the subject of taxation?

4. Would any constitutional provision be violated by imposing a tax, as provided in House Bill No. 10 in new draft, upon the earned income of individuals from whatever source derived with reasonable exemptions and deductions for certain expenses incurred and allowances for dependents as proposed in said bill?

5. Is it necessary in order to satisfy the provisions of the constitution that the rates and exemptions be the same on all classes of in-

come, as for instance on earned income and on income derived from other sources?

6. Would any constitutional provision be violated by a general act exempting from taxation standing timber, the owners of which enter into a contract with the state to pay a certain fee upon the severance of the timber, as provided in House Bill No. 5 in new draft?

7. If any exemption of timber be constitutional is it rendered unconstitutional by making it apply only to tracts of more than five acres and by permitting no such contract to be made to cover more than five hundred acres in any one year, as provided in House Bill No. 5?

8. Is the good will of any trade or business constitutionally subject to a tax by the legislature? If so, can the good will of a trade or business be measured *prima facie* by a percentage of the gross receipts of the trade or business?

9. If such good will is taxable is any constitutional provision violated by imposing a tax upon retail merchants and shopkeepers, as proposed in House Bill No. 401?

10. Is it constitutional for the state to distribute the proceeds of a state tax in the manner proposed in House Bill No. 15, which provides (a) that a part of the revenue therefrom be appropriated to the state forestry department for forestry improvement work; (b) a part be appropriated to the highway department for the maintenance of state highways; (c) a part be appropriated to the state educational department for the equalization of local school facilities; (d) a part distributed to towns as a reimbursement for tax loss by exemption (provided such exemption is not in contravention to the constitution); and (e) the balance be returned to the towns of residence of the several taxpayers in the proportion that the amount of total tax paid by residents of such town bears to the total amount of such tax paid in the state as a whole?

11. Is any constitutional provision violated by imposing a tax which is assessed and collected by the state and distributed to the several towns (1) on the basis of their respective needs, as proposed in paragraphs (b) and (c) section 2 of House Bill No. 15, or (2) on the basis of their losses by exemption, as proposed in paragraph (d) thereof, without reference to the proportion in which such towns contributed toward the payment of such a tax?

*Further Resolved,* That the president of the Senate be and hereby is directed to furnish a copy of the foregoing resolution to each of the justices, together with the report of the interim tax commission, copies of the several bills and the governor's message to the Senate thereon.

The following answer was returned:

*To the Honorable Senate:*

The undersigned, the justices of the supreme court, make the following answers to your inquiries, contained in your resolution adopted April 18, 1929.

The bills to which the questions relate cover a wide field of problems in taxation, and we have not undertaken to review all the bills in every detail to ascertain if perchance they may be objectionable in some minor respect. We do not conceive that it is our province to do so. *Opinion of the Justices*, 239 Mass. 606. We have confined our answers to dealing with the topics specified in your questions, together with such others as have been suggested in the briefs and arguments of counsel.

While our answers are limited as above indicated, we have not considered that a mere categorical reply to your inquiries would be a full discharge of our duty as your constitutional advisers. The proposals put before us involve a wide departure from the present methods of taxation in this state. They appear to be closely related, and, as a practical proposition, to be largely interdependent. They signify an effort to put into execution a general plan; and we assume that where a particular provision is objectionable, but the desired result can be reached in another and constitutional way, you would wish to be advised thereof. *Opinion of the Justices*, 81 N. H. 566, 570.

The procedure adopted by the senate and the house of representatives, in not requesting replies during a legislative session, has afforded ample opportunity for investigation and consideration. Counsel have made full use of the opportunity, as to many of the problems; and their thought and research have been of great assistance. We regret that upon some of the questions, especially those relating to an income tax, we have not had the benefit of adversative argument.

We take up the questions in numerical order.

Questions 1 and 2. The utility tax. The bill proposes to lay a tax upon gas and electric utilities at the average rate throughout the state, and to distribute to the several towns where the physical property is situated an amount equal to the tax on that property at the local rate. The money so distributed is to be used for local purposes. It is argued that this is a town tax, and consequently must be assessed at the town rate (*Boston, Concord &c. R. R. v. State*, 60 N. H. 87, 95); that although the town receives the equivalent of the local tax, the utility is taxed at the average rate, which may be more

or less than the town rate; that in this respect the proposed act does not meet the constitutional requirement, and that the portion of the assessment which is to go to the towns must be laid at the local rate.

In order to determine the scope and effect of the decision in *Boston, Concord &c. R. R.* v. *State, supra,* it is necessary to examine it in some detail. The statutory provisions under which the railroad tax was then assessed were that the tax was to be laid "in proportion to the taxation of other property . . . in the several towns and cities in which such railroad is located" (Gen. Laws, *c.* 62, *s.* 1), and was to be distributed one fourth to those towns, a part of the balance to towns where stock in the road was owned according to the proportion of the whole stock so owned, and the remainder (representing non-resident stock-ownership) to the state (*Ib. s.* 7).

The railroad's appeal from the assessment by the state board of equalization was heard by referees, who reported in favor of a tax laid according to the directions of the statute, *i.e.* at the rate in the particular towns wherein that railroad had property. The point decided was that since a part of the tax was to remain in the state treasury as state funds, the tax could not be deemed to be wholly that of the railroad towns, and hence that the assessment at the rate in those towns was unconstitutional.

The rule that "a state tax must be uniform throughout the state, a county tax throughout the county, a town tax throughout the town," (*p.* 95) was stated. This was followed by a discussion as to what the nature of this tax as a whole might be. It was not decided that it was not a state tax. That question was in express terms left open. "When the facts are found, the parties will have an opportunity to be heard on the question whether, for the purpose of assessment, the tax is a state tax, or of a triple character" (*p.* 97).

There is in that opinion no statement that the part paid to the towns by the state is a town tax. All that is said upon the subject is that "The disposition made of the tax when collected is evidence bearing on that question." (*p.* 96.)

This decision was followed by the enactment of the statute making railroads taxable at the average rate throughout the state. Laws 1881, *c.* 53. There has been no further consideration by the court of the validity of either statute. Although the case referred to has been cited very frequently, it has been as to incidental matters only. It follows that it is not authority for the proposition that by reason of the provision for a distribution to towns the proposed levy would necessarily be a town tax.

There are evident reasons why the property of these utilities should be taxed as a whole, rather than piecemeal. There is abundant justification in fact for taking this property out of the class taxed locally, and taxing it at the average rate throughout the state. This proposition appears to be conceded by everyone.

The tax being properly laid as a state tax, the question presented is whether the distribution of the tax by the state is such as to destroy its character as a state tax, and make it in part a local tax, which must be laid at the local rate.

The bill directs that the whole tax be paid into the equalization fund. Thus far, in the assessment of the tax and the payment into the fund, the proceeding relates strictly to a state tax. The questions relating to the validity of the distribution of that fund are considered in our answer to questions ten and eleven. It is sufficient for present purposes to state our conclusion that the distribution is within the legislative power.

Criticism has been offered, in behalf of the utilities, of the provision for a local assessment of their properties, as a basis for the contribution to the town by the state. We do not perceive how this concerns the utility's rights. It pays its tax directly to the state. The amount of that payment is not affected by the local appraisal, the accuracy of which is solely an issue between the state and the town.

The query has been put as to what would happen if the sum of the local appraisals exceeded the valuation put upon the whole property by the tax commission. One or both of two corrective processes would probably be put in motion. The tax commission might revise the local appraisals, and the state might appeal from the undervaluation of the whole by the commission. If every one rested content, the state might be called upon to contribute to the towns more than it received from the utility, particularly where the applicable local rates were higher than the average rate. This might result from errors in valuation, submitted to without appeal, or from findings that the utility's contention, that all the intangible value had in fact become a part of the value of the tangibles, had been proved to be true in the particular case.

Question 3. Taxation of franchises, etc. By express constitutional provision, franchises are taxable. Const. Pt. II, *art.* 6, Amendment of 1903. But declaring that franchises are taxable did not create any values. If a franchise has no value there is nothing to tax. *Opinion of the Justices*, 82 N. H. 561, 565. Whether it has value, and the amount thereof, are pure questions of fact. An *ad valorem* tax upon such value is constitutional.

We do not understand that by the use of the term franchises in this bill there is any purpose to include the mere franchise to be a corporation. It is understood to refer solely to public utility franchises, whether held by corporations, partnerships or individuals.

Argument has been advanced to the effect that such franchises are not taxable because the right granted is not exclusive, because the value thereof attaches to the physical property, because rates and charges are regulated by public authority and because franchises cannot be treated as assets for rate making purposes.

While it is true that the grant is not exclusive in the sense that the state cannot give a like grant to a competitor, it is also true that the whole policy of modern public utility legislation and control is against any such second grant. In theory, competition may have to be met. As a practical proposition, known to and acted upon by everybody, no competition will be permitted. As was said in *Grafton County &c. Co.* v. *State*, 78 N. H. 330, 332, one element of value in such an enterprise is that the owner can "sell at a fair price without competition."

A franchise, within the meaning of this bill, is a right granted by public authority to do that which would be forbidden but for such grant. Other definitions are collected in 26 C. J. 1008.

It has been suggested that authority to do a public utility business of the character here involved is not a franchise, since prior to 1911 it was a common right and the act then passed merely regulates the use of such right. The statute prohibits the exercise of public utility functions until the "permission and approval" of the public service commission have been obtained. The commission are limited to granting authority in cases where they shall find that it will be for the public good, and the grant is described as a "right, privilege or franchise." Laws 1911, *c.* 164, *s.* 13; Laws 1913, *c.* 145, *s.* 13; P. L., *c.* 240, *ss.* 21, 24.

It is also said that the right is still common, since it is open to anyone to obtain like permission, if he can procure the requisite finding by the commission. It is conceded that as a practical proposition no such finding can be obtained, because, it is said, the business is a natural monopoly. The policy has been to keep it a monopoly for sound economic reasons. The monopoly is not in the course of nature but of good business. Its maintenance is designed to promote economies by furnishing protection against things prompted by nature.

But in any event, whether the monopoly is natural or artificial, it

does not belong to the utility as of common right. It is acquired by the state's grant. It is desired because it has been taken out of the field of common right; and its exclusive character may give it value.

Upon whatever foundation it rests or by whatever terminology it is described, the unquestioned fact remains that under existing law the privilege once granted will not be duplicated. If the theoretical right to obtain a competing grant could be thought to detract from the value of the one already made, and the fact were so found, the value of the latter would be reduced accordingly.

The matter is not to be settled by a discussion of the precise meaning of words or phrases. We take it that you wish to know whether the "right, privilege or franchise" given these utilities is property, upon which you can lay a tax. In our opinion it is.

Comparison has been made with the right to use a manufacturing plant. This lacks the essential element that in the case of the public utility competition is excluded. A grant of the right to make all the cotton cloth used in New England would be deemed a valuable one, even though the price to be charged was subject to public regulation limiting it to what would yield a reasonable profit, and even though the public had a right, which everyone knew it would not exercise, to admit competitors to the field.

The provision in Public Laws, chapter 241, section 10, that franchises cannot be capitalized for rate making purposes (if constitutional) of course limits their value. But it is still true that the practically exclusive right to carry on a business of assured stability at what is termed a reasonable profit is in and of itself something of value. It is often sold for a large sum. Stocks of concerns with antiquated equipment which must at once be replaced are sold for more than the value of the junk. Stocks of other companies which have done nothing beyond securing a franchise and paying in the capital stock often sell above par.

The arguments advanced all tend to show the uncertainty and limitations of the privileges conferred by a public utility franchise. In so far as they are "burdens upon the granted franchises, diminishing their value," they are "to be considered in assessing the value of the . . . property for the purpose of taxation." *State* v. *Railroad*, 69 N. H. 35, 49. Whether in a given case they demonstrate that the grant has no value is, as before stated, a question of fact. If there is no value there is nothing to tax. If there is value, it could be taxed under the constitutional provision before referred to, and would be legally taxed under this bill.

The further contention has been made that the class prescribed is too narrow, that if the franchises of these utilities are taxed other franchises must be. The power of the legislature to classify property as taxable or non-taxable is a broad one, and the validity of its exercise has rarely been called in question. Classification of property by kind has always been recognized as proper. So, too, classification by use is said to be permissible. 1 Cool., Tax, *s.* 280. So long as there is a reasonable line of demarcation, and there is no attempt to make taxability depend upon a classification of owners, the legislative power in this matter is supreme. *Opinion of the Justices*, 82 N. H. 561, 574.

The rule is tersely expressed in one of the briefs. "Property can be classified for tax purposes. The taxpayers cannot." The test for taxability here proposed relates strictly to the property. That which is "owned and exercised in connection with such utility" is made subject to the tax. Other property is not so taxed, although owned by the utility.

It is true the language of the bill is in the personal form: "Every person . . . shall pay." But read as a whole the provision is for the taxation of a class of property. It is taxed because used in the described business. No one not a public utility can engage in the business (P. L., *c.* 236, *s.* 4; *Ib., c.* 240, *s.* 21), and the meaning of the proposed act is the same as though it read "all property used in the public utility business shall be taxed."

The argument advanced would invalidate the stock in trade tax, which has been in use since 1791. Laws, *ed.* 1797, *p.* 202. Stock in trade is taxed to merchants, but not when it becomes household supplies. Live stock is stock in trade of a dealer, but not of a farmer who raises it to sell. This statute received extended consideration in *White Mountain Fur Co.* v. *Whitefield*, 77 N. H. 340, and there was much discussion as to the nature of the use described by the statute. If reasonable classification according to use were not permissible, the whole opinion would be an academic dissertation, and the conclusion then reached that the test to determine whether certain property could be taxed as stock in trade "is to inquire as to the character of the owner's business" (*Ib.,* 343) would be wrong.

Use as a test has also been treated as though it was constitutional in considering the local taxability of certain property of railroads. *Boston & Maine Railroad* v. *Franklin*, 76 N. H. 459, and cases cited; *Boston & Maine Railroad* v. *Concord*, 78 N. H. 463. The same thing is true as to the similar situation of telephone companies (*New Eng-*

*land &c. Company* v. *Manchester*, 72 N. H. 166), and as to inheritance taxes upon legacies to charities (*Carter* v. *Story*, 76 N. H. 34, and cases cited). The application of a like test for tax exemptions has frequently been dealt with in the same manner. *Young Men's Christian Ass'n* v. *Keene*, 70 N. H. 223, and cases cited; *St. Mary's School &c.* v. *Concord*, 80 N. H. 436; *Keene* v. *Roxbury*, 81 N. H. 332; *Piper* v. *Meredith*, 83 N. H. 107.

The theory has been advanced that the value of the franchise attaches to and becomes a part of the tangible estate, and that therefore it cannot be appraised separately. It is of course true that the bill cannot be treated as permitting double taxation by calling the franchise and going concern value a part of the tangible estate, and taxing it as such, and then treating the same value as a separate item to be taxed again. The whole value of all the utility's property is all that can be taxed in any event. Whatever danger there may be of duplication, is a practical problem of fact, to be met and dealt with when appraisals are made. See the discussion of a similar question as to mills and water power in *Cocheco Mfg. Co.* v. *Strafford*, 51 N. H. 455. "In a case where it is necessary to consider interdependence of values, the problem of fair adjustment is one of fact." *Arlington Mills* v. *Salem*, 83 N. H. 148, 156.

As to other intangible property, which is commonly included under the term "going concern value," it is conceded, upon the authority of *Grafton County &c. Co.* v. *State*, 78 N. H. 330, that such interests are of value and taxable. But it is contended that these items also should be treated as merely enhancing the value of real estate, and not as something that should be valued apart from the realty. It is probably true that in most instances there is a close relation between the two; yet it by no means follows that they are inseparable, or that a proper valuation of the tangible property would in all cases cover the whole value of the going concern.

A steam plant used for generating electricity is not made worth more than the cost of reproduction by the fact that large sums have been profitably expended in building up an extensive demand for electric current. Beyond the valuation of the plant on a reproduction basis, there is not even an interdependence of value.

On the other hand, a water power for which there is no other use may fairly be said to have had value added to it because of like expenditures. Such a situation presents a case of interdependent values. In an extreme instance it might be true that neither would be of any value without the other. There might be no other use,

either present or prospective, for the water power; and the demand for electricity might be based upon a price below that at which current could be otherwise furnished. The combination gives value to each; and, as before suggested, the assignment of the proper part to the real estate is a fact finding process.

It is our opinion that House Bill No. 13 is constitutional.

Questions 4 and 5. Taxation of personal incomes. As pointed out in the *Opinion of the Justices*, 82 N. H. 561, 570, *et seq.*, all income taxes must be laid at a common rate. They must also be laid as of a common date. With the exception hereinafter noted, the proposed act conforms to these limitations, since the rate and the date of assessment are the same as in the existing law.

The exemptions as to earned incomes and incomes from intangibles need not be in the same amount. *Opinion of the Justices, supra,* 573 *et seq.*

The proposed exemption of $3500 for the head of a family, plus $400 for each dependent, appears to us to be in excess of what is permissible. The question presented concerns the power to exempt because of the amount of income received by the individual. It does not relate to the power to grant a general exemption as to a certain class of income. Such personal exemptions are granted upon a theory that everyone should have a certain amount of income tax free, and, except in a general way, they have no relation to the nature of the income. The ground upon which a substantial quantitative personal exemption is here sustained is that the exempted party is too poor to pay. It does not seem to us that a person having an income of $2000 can be said to be so poor that he ought not to share the expense of government with his fellow citizens, so far as the excess of his income over $2000 is concerned. As to that excess, he cannot justly be considered to be entitled to public charity. He is not so poor that his normal tax upon that excess ought to be abated because of his poverty.

The duty to contribute to the maintenance of government is a primary one, the performance of which is not to be excused for light reasons. It is also to be borne in mind that our constitution does not permit the laying of a graduated or progressive tax. A tax levy cannot be sustained here upon any theory that the richer one is the higher his tax rate should be. *Williams* v. *State,* 81 N. H. 341. It is only upon the narrow ground before stated that any substantial quantitative exemption to the individual can be sustained.

In view of the foregoing considerations, and of the present and prospective purchasing power of money, we are led to reconsider the

advice given in 1927, so far as it relates to amount. The house of representatives were then advised that we inclined to the opinion that a general exemption of $2000 could be sustained. The matter then under consideration was the validity of any substantial quantitative exemption. Attention was called to the difficulty in attempting to fix limitations, and the views expressed were declared to be tentative only. *Opinion of the Justices*, 82 N. H. 561, 570-575. Under these circumstances the doctrine that advisory opinions are not adjudications upon the questions presented is peculiarly applicable.

In attempting to fix limits expressed in concrete amounts, it is necessary to deal with facts, and different minds will come to different conclusions. A legislative enactment is not to be declared invalid for lack of constitutional power unless the conclusion is established beyond a reasonable doubt. *Rich* v. *Flanders*, 39 N. H. 304; *Opinion of the Justices*, 77 N. H. 611, 617. Applied to this situation, the test is resolved into an inquiry whether we think a given amount is one which some reasonable men might think came within the reason of the rule. If it is, its use is permitted, even though we think the fact should be found otherwise.

Applying this test, we are of opinion that an exemption of $1200 to a single person without dependents is as large as could in reason be thought to be valid under the principle limiting the exercise of this power. We also think that reasonable men might conclude that the principle would permit a larger exemption for those with families or dependents, but that this idea cannot be used to raise the largest exemption to a sum exceeding $2000.

No ground has been found upon which the exemption of $2000 to a private trust (section 10) can be sustained. The individual beneficiary may be given the same exemption as other individuals enjoy, but nothing more. The taxability of the income of these trusts should be the same as it would be if the income were received directly by the beneficiaries.

It has been suggested that the proposed income tax would be invalid because it would be laid upon individuals only, and not upon corporations. It was pointed out in *Conner* v. *State*, 82 N. H. 126, that there are difficulties in determining who shall be taxed because of the possibility of double taxation on one hand or failure to tax at all on the other. In that case it was decided that corporations might be excluded from the class taxed upon dividends and interest received, upon a theory that such receipts are passed on to stockholders and taxed to them.

The proposed law presents a different situation. It provides for the taxation of certain income earned in the course of transacting business, and that permanent improvements and betterments made to increase the value of the estate of the taxpayer are not to be deducted from gross income. The inequality of not taxing corporations is more marked here than under the present law. Improvements and betterments upon the corporate estate, or a surplus held in the treasury, would not be passed on to stockholders, and they would thus escape taxation if the business were incorporated, whereas they would be taxable in the case of an individual owner.

For this reason it seems to us that it is not permissible to exclude corporations from the category of those subject to a tax upon business income. Any inequality by reason of double taxation of income can be, and should be, avoided by exempting the dividends paid by such corporations, in so far as they are paid out of income which is taxed in this state. There will then be neither double taxation nor failure to tax. Such a provision would obviate the defect in the present income tax law, under which dividends, received by local corporations and by them in turn paid out as dividends to non-resident stockholders, go tax free.

The provision for the taxation of rents cannot be applied to rent paid for the use of real property situated outside the state, although the rent is received by a resident. It has always been the accepted rule that a state cannot lay a tax upon realty not within its jurisdiction. *Winnipiseogee Lake &c. Co.* v. *Gilford,* 64 N. H. 337, 349. The same principle applies to tangible personal property. *Union &c. Co.* v. *Kentucky,* 199 U. S. 194; *Frick* v. *Pennsylvania,* 268 U. S. 473; *Winkley* v. *Newton,* 67 N. H. 80.

In *Pollock* v. *Company,* 157 U. S. 429; s. c. 158 U. S. 601, it was held upon great consideration that a tax laid upon rent is a direct tax upon the land out of which the rent issues. *Opinion of the Justices,* 77 N. H. 611, 615, 626. While the question, whether a state could tax rent received for the use of realty over which the state had no jurisdiction, was expressly excluded from consideration in *Union &c. Co.* v. *Kentucky, supra,* the logic of the later decisions points plainly to the conclusion that such a tax would be in violation of the provisions of the federal constitution. *Natl. Life Ins. Co.* v. *United States,* 277 U. S. 508; *Gillespie* v. *Oklahoma,* 257 U. S. 501.

We are of opinion that a state cannot tax income received as compensation for the use of either real estate or tangible personal property which has a *situs* outside the state. To avoid misapprehension,

we add that this limitation does not apply to the taxation of intangibles owned by residents. *Hawley* v. *Malden*, 232 U. S. 1.

The provision of section 21, allowing a taxpayer to use a fiscal year differing from that prescribed for taxpayers in general is plainly in conflict with the principle of equality as understood and administered in this state.

Questions 6 and 7. The taxation of growing timber. House Bill No. 5 provides for the exemption of standing wood and timber from taxation upon the owner's entering into a contract with the state to pay ten per cent of the stumpage value at the time of severance. It is entirely clear that the act is not within the limits fixed by the constitution. It undertakes to make tax liability a matter of bargain and sale at the option of a certain class of property owners. Others have no such option. It seems unnecessary to say more upon this subject. The plan is so at variance with the whole theory of taxation in this state that its invalidity is not open to doubt.

It has been urged in argument that the plan is sustainable under the doctrine of *Keene* v. *Roxbury*, 81 N. H. 332. That case is not authority for granting an optional exemption to members of a class of taxpayers. It merely sustains the laying of a charge upon one municipality to be paid to another, when the latter discharges public obligations that are of benefit to the former.

The claim that timber growing is a matter of general public interest, for the promotion of which a tax might be laid, is true only to a limited extent. Such public interest may be thus promoted to the extent indicated in our answer to questions ten and eleven. But there is no power to lay a tax to be expended as a bounty to individual timber owners. *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1. They stand no better than the manufacturer.

While the plan proposed by the bill is thus objectionable, we are of opinion that a similar result may be reached by the enactment of a general law removing standing timber from the class of taxable estate, and imposing a tax thereon to be levied when the growth is severed from the realty.

In *Conner* v. *State*, 82 N. H. 126, it was pointed out that the constitutional amendment of 1903 had broadened the taxing power, so that a tax can now be laid with incidence depending upon some factor other than ownership of property. *Opinion of the Justices*, 82 N. H. 561, 567, 568. In the *Conner* case the issue was whether the receipt of income could be used as such a factor. It was decided that it could be, and the suggestion was made that "Other questions as to

the present limits of this power may hereafter arise." *Ib.*, 133. The present situation calls for a consideration of the matters as to which opinion was then withheld.

It appears to us that under this amendment, as construed in *Conner* v. *State, supra,* a tax may legally be laid upon wood and timber upon the event of severance. Such a law would include a distinctive class of property, would be imposed upon a certain event and would apply to all similarly situated. The classification would be supported by abundant reasons; and the incidence of the tax would depend upon a characteristic event, not common to other property.

This tax could not be correlated with other taxes, and therefore the rate could be fixed without direct relation to that imposed by other taxing statutes. *Opinion of the Justices,* 82 N. H. 561.

Denial of the benefits of this form of taxation to owners of tracts of less than five or more than five hundred acres is not permissible. Small amounts of property are sometimes exempted from taxation because of the presumed poverty of the owner, or because the cost of assessment and collection would be unreasonably out of proportion to the tax. But these reasons have no application here. It has never been suggested that poverty was a reason for laying a tax upon those thus unfortunate; and as to expense, the proposed provision would call for laying and collecting many taxes instead of one.

Nor can taxes be increased in ratio because the individual taxpayer owns more property than his neighbor. All taxes on like property and for like purposes must be equal. *Williams* v. *State,* 81 N. H. 341.

Questions 8 and 9. Taxation of retail merchants and shopkeepers. Your inquiries as to House Bill No. 401 involve the question of measuring a tax valuation, in part, upon the basis of gross sales. The bill as drawn contains certain provisions as to the validity of which we have grave doubts. It was said at the argument that the real object in view was the imposition of something as near to a sales tax as constitutional limitations would permit. The structure of the bill gives further countenance to that idea. We have therefore taken up the consideration of the validity of a tax upon sales.

We have hereinbefore advised you that the power given by the constitutional amendment of 1903, to place the incidence of a tax upon some factor other than ownership, is not limited to imposing a tax upon incomes. It is a general power, and may be applied to any situation which affords a rational basis for a classification of the kind permitted; that is, the determination of the taxability of property

"by some fact other than mere ownership." *Conner* v. *State*, 82 N. H. 126, 128, 129.

As pointed out in the *Opinion of the Justices*, 77 N. H. 611, 616, the view that the amendment would give the legislature "power to impose in its discretion any kind of tax under heaven or known among civilized men" (Jour. Const. Con., 1902, *p*. 597) was advanced by some of the proponents of the amendment, in the convention. While this view is too inclusive, since the power given still relates to property taxation only; yet the amendment, as heretofore interpreted, contains a grant of a broad and general power. Authority is thereby given to lay various kinds of *ad valorem* taxes upon property, incident upon some characteristic event, which may fairly be considered to reasonably delimit a class of property, so that the selection cannot be rejected as arbitrary, if the event itself affords some rational basis for the imposition of a tax.

It is immaterial whether such taxes are called excises or something else. In the sense that they are dynamic rather than static, that their incidence is dependent upon the happening of an event rather than upon the mere existence of property, they may properly enough be classed as excises. In the features of being laid upon property and *ad valorem*, they are like estate taxes. Their imposition involves no new or strange principle. They have long been in use elsewhere. The object of the amendment of 1903 was to permit their use here. They are the kinds of taxes which the amendment describes.

If they are properly denominated excises, that fact does not prove that all kinds of excises are now permitted. The present limitation of the taxing power is fixed by the language of the amendment and not by a classification of taxes by authorities upon economics. The people "were not asked to vote for or against excise, commodity, succession or privilege taxes, but were in plain terms invited to consider a tax upon property." *Williams* v. *State*, 81 N. H. 341, 349.

Because the power to tax is still thus limited, the house of representatives were advised that an occupation or privilege tax would be unconstitutional. *Opinion of the Justices*, 82 N. H. 561.

A tax upon gross sales comes clearly within the present constitutional grant of power. It is a tax laid upon property upon the happening of a characteristic event. Passage of property from seller to buyer is fairly comparable with descent from ancestor to heir, or the receipt of income. Each is a descriptive event, indicating the transmission of property in a distinctive way. All are given general recognition elsewhere as affording sound economic occasion for the imposi-

tion of a tax. It is therefore our opinion that a tax upon sales made within the state would be constitutional.

In the proposed income tax law there is a provision for taxing the net profit upon sales. If a tax should be laid upon gross sales, that upon the sales profits of the same class of taxpayers should be omitted. The incidence of these two taxes would be so nearly identical as to result in double taxation of a sort which is not permitted under our constitution. In order that any form of double taxation be sustainable here, it must at least appear that the incidence of the two taxes is determined by separate and distinct factors.

One feature of the proposed bill which has been the subject of extended argument would probably be included in such a sales tax as the bill indicates you wish to consider. The sales proposed to be taxed are those of "retail merchants and shop-keepers." It is argued that this class of taxpayers is so limited that the selection must be deemed an unreasonable discrimination, and therefore a violation of the principle of equality. Objection is made because a tax would be laid upon retailers only, while wholesalers and manufacturers would be excluded.

The generating source of the tax is the transfer of merchandise from the producer to the consumer. It is proposed to tax the property but once during this process, and the event is fixed at the transfer from the retailer. If the tax were applied to the wholesaler also, the result would be two taxes put upon the property in the marketing process. Assuming that this might lawfully be done, it still remains true that the practical effect of such a provision is one which it would be reasonable to avoid. The situation affords a proper basis for the exercise of the legislative power of selection. *Conner* v. *State*, 82 N. H. 126, 132.

For the reasons before suggested, we respectfully request that we be excused from further answering your inquiries as to the validity of the other provisions contained in House Bill No. 401.

Questions 10 and 11. The equalization fund. The taxes which are proposed to be distributed under House Bill No. 15 are all state taxes, and could be devoted to any use for which the legislature might appropriate state money.

The appropriation for the state's forest lands is clearly legal. It is understood that the object in the state forests project is threefold. It stabilizes the flow of streams, thereby improving water powers and water supplies; it provides natural attractions in the nature of public parks, and it promotes scientific timber growing by individuals

through the practical example of its capability to yield profit. Any and all of these purposes are legitimate objects for the expenditure of public funds.

The provision that the state shall assume a larger part of highway maintenance, and the appropriation therefor, are also lawful. Towns are but subdivisions of the state, given certain governmental powers and charged with some local government duties. Any part or all of the local duties and obligations may be assumed by the state. It is within the legislative power to lay upon the state the full charge of class I and class II highways. Of course it can make appropriations to carry out the purpose of such an act.

The grant of school aid to the poorer towns is but an extension of the law now in force. It is a division between the state and the towns of the cost of education. "The power to distribute the public burden, . . . like that to divide the public property upon the division of a town, 'is, in its nature, purely legislative. No general rule can be prescribed, by which an equal and just division, in such cases, can be made. Such a division must be founded upon the circumstances of each particular case'. *Bristol* v. *New Chester*, 3 N. H. 524, 534;" *Keene* v. *Roxbury*, 81 N. H. 332, 337.

The half of the municipalities in the state which are richer in tax paying property than the other half, and therefore enjoy the benefit of a lower tax rate, have no constitutional right to a continuance of present conditions. Nor have the taxpayers therein any such right. The legislature may annex a poor municipality to a rich one, and thus increase the tax burden in the latter; or it may abolish all municipal division as to taxes, and make the tax levy equal throughout the state and for all purposes. It may do this as to one governmental purpose, or as to many or as to all. In none of the cases has any individual taxpayer any legal cause for complaint. Having this power to compel the rich municipality to assume a full share of the overburden of the poor municipality, it can give like relief in a lesser degree.

The provision for a distribution to the towns to compensate for the loss of the timber tax presents a somewhat different question. It seems that three propositions are considered by the legislature to be established facts: the timber owner ought not to be subject to the annual estate tax; the towns ought not to lose the revenue, and the state ought to supply it.

It also appears to be the accepted theory that the preservation of growing timber is a matter of state wide interest, for the promotion of which the state at large can be taxed. Whether these propositions

are true or otherwise is immaterial here, since they have a sufficient basis in fact to warrant the legislature in acting upon them. A state tax for the promotion of this project would be constitutional.

The more difficult question relates to the way in which this tax would be distributed. The basis for the proposed distribution is the fact that there is growing timber in the town. By another act, this timber is made non-taxable by the town. Its non-taxability is decreed for the promotion of a state-wide interest. The loss falls upon the town, which is left to perform all its assigned governmental functions, not only for the benefit of the taxable estate in the town, but also for the benefit of a greater or less quantity of estate it cannot tax.

". . . it is the almost universal custom to give the tax on tangible property to the towns in which the property is situated, and to require such towns to provide the necessary protection for the property and those who occupy or have charge of it . . ." The property "needs the same police and fire protection as other property. . . ." The municipality "must educate the children of the men employed to operate it and care for those who are unable to care for themselves." The towns "are compelled to protect" the property. *Boston & Maine Railroad* v. *Franklin*, 76 N. H. 459, 464, 465, 468.

As we understand the situation, the legislature deem the added burden too great to be borne by the towns. If the state cannot help, the project must fail. The project, as before stated, being one of state-wide interest, it seems plainly to follow that the state can properly aid in the way proposed. Although the loss is local, the gain is thought to be state-wide. The town is called upon to bear local expenses because of the existence of the untaxed estate within its borders. The existence and untaxed state of this property being of benefit to the state at large, the state may reasonably assume the burden which would otherwise fall upon the town.

The situation is, in substance, like that presented in *Keene* v. *Roxbury*, 81 N. H. 332. As it was there held that the legislature may impose upon one town a part of the public expenses of another town which are of benefit to the former, so here it properly assigns to the state a burden put upon a town for the benefit of the state.

By section 24 of House Bill No. 13, the public utilities tax is also to be paid into the equalization fund; and a distribution is to be made to the towns of so much money as they would severally have received from a local tax upon public utility property in the town, which the provisions of the bill exclude from the class taxable locally. This distribution to the towns is to be sustained for reasons similar to those

applicable to the timber tax problem. Here again, the legislature deem a certain legal method of taxation to be desirable, and at the same time conclude that the loss which it will entail upon the towns is one they ought not to be called upon to bear.

It may be said that the cases differ in that the exemption of timber from the annual tax is a matter of state-wide interest, and that there is no such element in the case of the utility tax; that the only reason for payment to the towns in the latter case is that the state has received a tax from the property in the town. But the proposition to which the legislature may give controling weight is the same. The fact that there is property in the town which does not contribute to town expenditures made necessary by the existence of the property therein is the same in both cases.

We think that this element alone is sufficient to warrant a contribution to the towns thus burdened. Of course the result follows more plainly in the case of the timber tax, where it is clear that a state purpose is served by the exemption. But state aid to relieve the burdens put upon some towns and not upon others, or put upon towns in differing degree or amount, may be granted by the legislature. If the burden put upon the town is one the legislature may rightly impose, relief therefrom by an appropriation of state funds is permissible.

In this aspect, the relief granted is very like that as to school money. Certain public duties are imposed upon all towns, but the state aids the poorer ones in the discharge of some of those obligations. So long as such aid is distributed upon a fair and equitable basis, it is merely an exercise of the legislative function of determining where, in the aggregate, the burden incident to the performance of public duties shall rest.

In like manner the statute providing for contribution by the whole county, as highway aid to a town therein which is burdened by highway costs (P. L., c. 80, s. 4), has always been administered without question as to its constitutionality. *Rye* v. *County*, 68 N. H. 268; *Bridgewater* v. *County*, 74 N. H. 549. As in cases under that statute the issue is one of "equity and justice," to be decided as one of fact, (*Bridgewater* v. *County, supra*, 550), so here it is a question of like character, to be decided by the legislature.

In a similar way, the extension of public utility service to more remote places may be ordered, even though it increases the cost to more thickly settled communities. The underlying principle is the same. The object is "to equalize or apportion so far as reasonable

the advantages . . . and to promote the growth and prosperity of the whole. . . ." *Parker-Young Co.* v. *State,* 83 N. H. 551.

It appears to be the legislative view that a tax at the average rate, laid upon these properties as a whole, will result in a more equitable and just apportionment of their share of the public burden than assessments laid upon parts and at different rates, both arbitrarily determined by town lines. Hence the power to tax is to be taken from the towns. This results in a redistribution of revenue; and redistribution of revenue may call for a reassignment of burden.

It has been said that the real object of this provision of the bill is to reach the situation created by the construction of extensive power plants in rural towns, where public charges are small in amount and the tax rate would be very low, if these new properties were included in the inventory. But motives do not limit the legislative power. If the act be within the authority granted, the motive inducing its passage is immaterial. *Farnum's Petition,* 51 N. H. 376.

Nor can it be justly said that such a motive is not a proper one. There is no vested right of a taxpayer that any particular form of taxation, or division of taxing districts, shall continue. If modern conditions make ancient divisions or plans for distributing the tax burden inequitable, it would seem to be a plain legislative duty to enact such constitutional laws as will remedy the defect.

No town and no taxpayer therein, except the utility in question, has any right which is affected by this provision. The towns will receive the same revenue as before. Moreover, the property in question might have been made taxable for state purposes, without any provision for compensating aid to the towns.

Unless there is an infringement upon the utility's rights, the provision is constitutional. There is no such infringement unless a payment by the state to the town of the same amount the town would receive from a local tax proves that the property is, in substance, taxed locally. This feature is, as stated in *Boston Concord &c. R. R.* v. *State,* 60 N. H. 87, evidence upon that proposition. But it does not appear to us to be controlling. The plan by which the contribution to the towns is determined is not essential to its validity. The amount "might have been fixed without any reference to the subject of taxation." The fact that "the legislature adopted the current tax rate . . . as one of the elements to be used in fixing the amount of the contribution, does not alter the nature of the charge imposed." *Keene* v. *Roxbury,* 81 N. H. 332, 335, 337.

Lack of relation between the state tax upon the utility and the

contribution made by the state to the town is further shown by the fact that while the amount received by the town is fixed by a computation as of a local tax, the fund from which it is paid by the state may not be derived wholly from the utility. As suggested in argument, if the local tax rate is above the average for the state, the state pays to the town more than it receives from the utility as the tax upon the property in that town. Our conclusion is that the distribution to the towns is not an infringement upon the constitutional rights of those utilities.

The proposed distribution of a possible surplus of the fund is based upon the income tax payments in the several towns. This is, in effect, a provision that income taxes are not to be used for state purposes beyond the calls of the fund. So long as there is no distribution to the towns other than the amounts received as income tax, the provision is unobjectionable. But no part of other taxes could be distributed upon this basis.

This is not a provision for aiding needy towns, but for the distribution among the parts, of a tax laid upon the whole. It is not a legislative appropriation, in the ordinary sense of that term, but rather a return of surplus funds to the contributors. Such a distribution must be in proportion to the contributions made to the fund to be distributed.

If the distribution takes the form of a true appropriation, made to equalize the public burden, it must be upon some reasonable and equitable basis. We do not think that the amount of income tax payment would furnish such a basis for a distribution of other taxes to the towns.

If the plan of taxation comprehended in the several bills is enacted, it is not likely that any difficulty will arise as to the distribution of a surplus. But if a departure should be made from the plan as a whole, a different situation might be presented; and we call attention to it to prevent any misconception as to our views upon the subject.

The administration of these new and somewhat complicated proposals might reveal difficulties which are not apparent upon a consideration of the bills in the abstract. A litigated case not infrequently brings into view questions of law which would otherwise pass unnoticed. It is in part for these reasons that advisory opinions have not usually been treated as full adjudications upon the questions as to which counsel has been given.

In the *Opinion of the Justices*, 80 N. H. 595, 606, 607, a somewhat larger measure of authority was attributed to them. "Although

advisory opinions such as we now are giving are not judgments establishing the law, in practice they appear to be relied upon as authority as fully as decisions in litigated cases. Whenever possible it has been the practice in recent years to hear argument from parties holding opposing views. The practical result is that these opinions have in effect the weight of declaratory judgments upon questions within the jurisdiction of the court of which the justices are members." *Ib.*

The true standing to be ascribed to them seems to be that while they are persuasive they are not controling; and their persuasive value may be greater or less, as the circumstances under which they were rendered show finality of judgment or the reverse in the minds of their authors.

ROBERT J. PEASLEE.
LESLIE P. SNOW.
JOHN E. ALLEN.
THOMAS L. MARBLE.
OLIVER W. BRANCH.

January 7, 1930.

*Robert W. Upton,* for the New Hampshire Division of the New England Council, and

*Elwin L. Page,* for certain members of the interim tax commission, both by brief and orally, in favor of the bills presented by the commission.

*Allen Hollis* (by brief and orally), for the Grafton Power Company &c., and

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Demond* orally), for the Public Service Company of New Hampshire, opposed to the utility tax bill.

*Winthrop Wadleigh* (by brief and orally), for senator Fred T. Wadleigh, in favor of House Bill No. 401.

*Hamblett & Hamblett* (*Mr. Robert B. Hamblett* orally), for the Standard Oil Company of New York, and

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the National Chain Store Association, opposed.

*John R. McLane* and *John P. Carleton* (*Mr. Carleton* orally), for the Society for the Protection of New Hampshire Forests, in favor of House Bill No. 5.

*Foster & Lake,* for the New Hampshire State Grange, in favor of House Bills Nos. 10 and 13.