GRAFTON.

---

BOSTON, CONCORD & MONTREAL RAILROAD *v.* THE STATE.

The tax of a railroad, authorized by Gen. Laws, c. 62, is not a town tax, and is not assessable in proportion to the taxation of other property in the towns in which the railroad is located.

APPEAL from the assessment of the plaintiffs' tax of 1879. Facts found by referees.

*Ladd*, for the plaintiffs.

The taxing power granted by the people to the general court is not without limit or condition, but it is "to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and residents within the said state, and upon all estates within the same." Const. N. H., Part 2, Art. 5. And the same limitation is conclusively implied in the language of Art. 12 of the Bill of Rights: "He is, therefore, bound to contribute his share in the expense of such protection." "And, while the public charges of government * * shall be assessed on polls and estates in the manner that has heretofore been practised, in order that such assessments may be made with equality there shall be a valuation of the estates within the state taken anew once in every five years," &c. Part 2, Art. 6. "The equality here intended," say the court, "is that the same tax shall be laid upon the same amount of property in every part of the state, so that each man's taxable property shall

bear its due portion of the tax according to its value. And a tax thus laid upon the taxable estate of the people is a proportional tax, within the meaning of the constitution." *Opinion of the Justices*, 4 N. H. 565. " Taxes," says Judge *Cooley*, " differ from subsidies, being regular and orderly; and they differ from the forced contributions, loans, and benevolences of arbitrary and tyrannical periods, in that they are levied by authority of law, and by some rule of proportion which is intended to insure uniformity of contribution and a just apportionment of the burdens of government. In an exercise of the power to tax, the purpose always is, that a common burden shall be sustained by common contributions, regulated by some fixed general rule, and apportioned by the law according to some uniform ratio of equality. While, therefore, the power is great and imperative, it is not arbitrary; it rests upon fixed principles of justice, which have for their object the protection of the tax-payer against exceptional and invidious exactions, and it is to have effect through established rules, operating impartially." Cooley Taxation 2.

The report shows the rate imposed upon each of the roads. For illustration, take the Cheshire, which is lowest of the roads located in towns, and the B., C. & M. The difference of rate is seventy-six cents on each $100 of valuation; that is, the tax of the B., C. & M. is a little more than 70 per cent. larger on the same property than that of the Cheshire. Now, what difference in principle can be pointed out between this discrimination, and the laying of a tax of seventy-six cents on one road while all others in exactly the same situation are entirely exempt? And if the legislature may lawfully do that under the constitution, without infringing the rule of equality therein prescribed, why may they not lawfully impose upon a single railroad the whole burden of supporting the state government, and allow all other roads and all other property in the state to go scot free? See remarks of *Sharswood*, J., in *Hammett* v. *Philadelphia*, 65 Penn. St. 146, 151. "A conclusion so monstrous shows that the premises must be wrong. Such a measure would not be taxation, but confiscation." No one, so far as we are aware, has as yet had the hardihood to argue that such a discrimination in the levying of a state tax could be sustained. But it has been suggested that the inequality of taxes upon other property in the different towns of the state shows a discrimination of the same sort, which is admitted on all hands to be lawful. The inhabitants of towns may assess themselves by vote for a great variety of purposes,—highways, bridges, sidewalks, school-houses, support of the poor, fire department, libraries, soldiers' monuments, cemeteries, parks, setting out and protecting shade-trees, &c., &c. This shows one reason why the tax in the different towns should vary. There are a multitude of other reasons, growing out of the geographical location of the several towns and the management of municipal officers, as well as the corporate

action of the towns themselves, which we need not stop now to examine.

The line that divides a municipal tax from a state tax is so broad and perfectly marked, that it seems impossible to mistake, as to any tax, in which class it stands. What single attribute of a municipal tax has the tax imposed by the general laws upon railroads? We submit, not one. (1) A municipal tax is voted by those who are to pay it. This tax is not raised by vote of any town or city board; the railroad has no vote in the town-meeting on the question of taxes, or in cities in the election of city officers. (2) A municipal tax is collected by a collector chosen by the town or city for that purpose, and is paid over to a treasurer selected by the town or city to receive it. (3) The money arising from a municipal tax is appropriated by the proper municipal authorities, according to the will of the municipality, as shown by the proper vote. The money arising from this tax goes into the state treasury, and is distributed by a general law of the state. (4) The machinery for assessing as well as collecting a municipal tax is wholly municipal in its character. The whole machinery for assessing and collecting this tax appertains to the state as a body politic. Every officer who has anything to do with the matter from beginning to end is a public officer of the whole state, and not at all the officer of any town or city. (5) The legal persons on whom the tax is laid all belong to the same class; they are all brought into existence by the sovereign power of the state to subserve the same beneficial purpose; they are all endowed with the same powers and privileges, charged with the same obligations to the public and the state, and engaged in the same business. High considerations of public policy, therefore, forbid that they should be turned over to the uncertain, unequal, and fluctuating exactions of the different towns through which they pass;—hence, no reason exists to justify astuteness in working out for the law a meaning which it does not fairly bear. (6) The distribution of the money after it is paid into the state treasury shows that it is in no sense a municipal tax. One fourth goes to the towns through which the road passes;—but how is this one fourth divided? According to the value of the property of the corporation in the respective towns? Not at all. "According to the share of the capital of the corporation expended for its buildings and right of way." If the road had the right of way given them through a poor and mountainous town, in which they have erected no building except a station-house at an expense of $300, no matter if they expended $150,000 in digging through a ledge in such town, the town draws from the state on account of the building, but nothing on account of the vastly enhanced value of the land for railroad purposes by reason of the expenditure in preparing it for the track. This part of the distribution is arbitrary, and not at all consistent with the idea that the tax is a municipal tax. But what becomes of the

rest of the money? "To each town in the state in which any stock in the road was owned on the first day of April preceding, such proportion of the residue of said tax as the number of shares owned in said town bears to the whole number of shares in the corporation: the remainder for the use of the state." Upon the notion that this is a municipal tax, here is the legislature making an absolute gift of money, which belongs to the towns wherein is situated the property on which it has been levied, to other towns in which no part of the property is located, and dividing it according to the accident of ownership of shares on the first day of April, and then appropriating the remainder—a large amount of money situated in the same way—to the use of the state.

The same inequality as that of which we complain does not exist with respect to the general state tax, which is apportioned among the several towns according to the valuation of their property, and in no other way. It is believed that the railroad tax is a solitary exception in the history of the state of a state tax which calls for one sum to be paid on one hundred dollars of property belonging to one citizen, and another different sum to be paid on one hundred dollars of property of the same kind belonging to another citizen, engaged and using the property in the same business. "The constitution of Wisconsin requires the rule of taxation to be uniform; and this means that all kinds of property not absolutely exempt must be taxed alike, by the same standard of valuation, equally with other taxable property, and coextensively with the territory to which it applies." *Gilman* v. *City of Sheboygan*, 2 Black 510. "Taxing by a uniform rule requires uniformity not only in the *rate* of taxation, but also uniformity in the mode of assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation. But this is not all: the uniformity must be coextensive with the territory to which it applies. If a state tax, it must be uniform all over the state; if a county or city tax, it must be uniform throughout the extent of the territory to which it is applicable." *Exchange Bank of Columbus* v. *Hines*, 3 Ohio St. 1. So Judge *Cooley* says,—"As to all taxation apportioned upon property, there must be taxing districts, and within these districts the rule of absolute uniformity must be applicable." Cool. Const. Lim. 495 *et seq.* Does not this tax extend throughout the state? And does not our constitution, as plainly as that of Wisconsin or Ohio, require uniformity? Such was the opinion of the court in 1828; and the soundness of that opinion we have not heard questioned. *Opinion of the Justices,* 4 N. H. 565.

*Tappan*, Attorney-General, for the defendant.

The plaintiff claims that the constitution requires that all property shall bear its proportionate share of the public expenses,— shall be taxed equally,—and that, as their tax is more than it would

have been if all property had been thus taxed, it should therefore be reduced. This objection goes to the foundation of this whole matter, and, indeed, to the constitutionality of the law by which the tax is imposed, and to our whole scheme of taxation. If this interpretation of the constitution is correct, this and all other taxes must be declared illegal. But we deny that this is the true meaning of the constitution : its framers did not contemplate any such Utopian theory of equality of taxation. The whole practice of the government in all its branches, from the adoption of the constitution to the present day, fully demonstrates this. The best index to the meaning of the constitution is found in the official action of its framers under it. It is well, therefore, to look at the legislation upon this subject immediately following the adoption of the constitution, which was largely influenced by those who made that instrument, and who must have known its meaning.

The system of taxation then in vogue was arbitrary and specific. Taxation was confined to certain specified property, which was taxed at specific rates, not imposed upon all property, and in proportion to its value. This system was continued under the new constitution, with very slight changes, for about forty years,—as long as any of the framers of the constitution remained in active life. It is found in the act of February 22, 1794, being almost an exact reproduction of the laws in force when the new constitution went into operation. It is entitled "An act to establish an equitable method of making rates and taxes," &c. The articles to be taxed are polls, real estate, horses, neat stock, money at interest, stock in trade, and property in the public funds. It will be seen that this does not embrace nearly all the property of the state : sheep, carriages, bank stock, in addition to all that is now omitted from the tax-list, are conspicuous by their absence. But the rates are especially noticeable ; they are all *specific:*—a poll was rated at eight shillings ; a stallion, which had been wintered three winters, one pound ten shillings ; other horses, wintered five winters, four shillings; four winters, three shillings ; three winters, two shillings ; and two winters, one shilling. Oxen wintered five winters, three shillings ; cows five winters, two shillings ; other neat stock four winters, one shilling and sixpence ; three winters, one shilling ; two winters, sixpence ; orchard land, one shilling and sixpence an acre, or so much as will make ten barrels of cider ; arable land, one shilling an acre, or so much as will produce twenty-five bushels of corn ; mowing, one shilling an acre, or what will produce one ton of English hay ; pasture, so much as will keep a cow, being called four acres, five pence per acre ; mills, wharves, and ferries, one twelfth of their net yearly income, deducting repairs ; stock in trade half of one per cent.; and money at interest and in public funds, three quarters of one per cent. It will be seen that these rates are extremely arbitrary, and disproportioned to the value of the property : there is no attempt at

equality. The five-year old horse, worth $200, pays no more than the horse of the same age worth but $20, and so of other property. This is the practical interpretation given to the constitutional provision by those who made it; and their successors, the legislators and courts, from their day to ours, have, by their official action, as fully ignored the interpretation which the plaintiff gives it. The system of taxation which we have described continued in force, with little change, until 1833, when it was first enacted (Jan. 4, 1833) that property should be taxed upon its appraised value; but little was added to the property to be taxed. By the Revised Statutes of 1842 the scheme of taxation as it now exists was established, but many special exemptions have been made. Now this system neither taxes all property, nor taxes equally what it does tax. Millions of property are omitted; other millions are exempted by law. In this are embraced church and school property, farming utensils and tools of trade, animals under eighteen months old, public and private libraries, the contents of the fifty thousand dwellings of the state, and many other items, of vast value in the aggregate, besides the many millions of railroad and manufacturing property exempted by law for a certain period. It is estimated that the property thus exempted from taxation is equal to fully one fourth of the sum of the whole valuation of the state, or more than fifty millions of dollars. Among the property thus escaping taxation is about one third of the property of these plaintiffs, who now so earnestly complain because all property is not made to bear its equal share of the public expense. Nor is a like burden placed upon all that is taxed. We have seen how unequal were the rates imposed by the fathers, and their sons of the latter days have shown themselves equally regardless of the plaintiffs' theory. Take the savings-bank tax as an illustration: A few years ago, when the average rate of taxation in the state was about three per cent., deposits in savings-banks were taxed but three fourths of one per cent.; and now, when other property pays about $1.60, those deposits, amounting to about $30,000,000, pay but one per cent. Other illustrations to the same end might be given.

Thus we see that the whole practice of the government, from the day of its adoption, has been in direct conflict with the plaintiffs' interpretation of the constitution. The authors of that instrument, and the legislatures and courts of the last eighty years, were either ignorant of its meaning, or wicked violators of it, if that interpretation is correct. This view is sustained by all the best authorities. The substance of the authorities on the subject of " equal taxation " is well stated by Chief-Justice *Waite:* " Absolute equality in taxation can never be attained. That system is the best which comes the nearest to it. The same rules cannot be applied to the listing and valuation of all kinds of property. Railroads, banks, partnerships, manufacturing associations, telegraph companies, and each one of the numerous agencies of business which the

inventions of the age are constantly bringing into existence, require different machinery for their purposes of taxation. The object should be, to place the burden so that it will bear as nearly as possible equally upon all." *Tappan* v. *Bank*, 19 Wall. 490. See, also, an admirable statement of the whole matter, by *Black*, C. J., in *Sharpless* v. *Mayor of Philadelphia*, 21 Penn. St. 168, and Cool. Tax. 124, where the subject is fully considered, and authorities cited. *Grim* v. *School District*, 57 Penn. St. 433 ; *People* v. *Worthington*, 21 Ill. 171; *Durach's Appeal*, 62 Penn. St. 491 ; *Commonwealth* v. *Savings Bank*, 5 Allen 428 ; *Lowell* v. *Oliver*, 8 Allen 247.

*Barnard*, for the plaintiffs.

The cutting down of railroad expenses, during the last five or six years, has included not only economy in the true sense of that term, but, as well, the putting off to a more prosperous era the various items of repairs arising from use, deterioration, and increase of rolling stock, which may for a few years be deferred, but sooner or later must be made. In getting at the real value of a railroad, its income is undoubtedly evidence of value, more or less important according to circumstances, but it should at least be based upon a series of years ; and in the same connection should be considered, among other things, the character of the road-bed, the condition of the sleepers, rails, engines, cars, repair-shops, fences, depots, and other buildings of the road, and also the character of the country through which it passes, whether thickly or sparsely settled, whether it passes through cities and large villages, manufacturing or agricultural districts, as well as its business connections with other roads, and the character, amount, and kind of business carried on over its line, and the facilities with which it may be done. All these elements must, more or less, with others, enter into the question of value of a railroad. As stated by Justice *Breese*, in *Illinois* v. *Illinois Central R. R. Co.*, 27 Ill. 64: "In connection with this [that is, the productiveness of the property], and possibly of even greater importance in forming a just opinion of real value, would be the inquiry, What would prudent men give for the property as a permanent investment, with a view to present and future income?" And we might add, where a sale is impracticable, What would prudent men give for a series of years as annual rent net, after taking into consideration all the elements we have mentioned, with the contingencies attending the business? Such a sum would represent substantially the net income on which value of the property might be based.

Would it be contended, if the directors of a railroad corporation should use all their earnings in building extensions, or in laying double, treble, or quadruple tracks, and for that reason report no balance of income as net earnings, that therefore the property should escape taxation? Take the plaintiff corporation : they could

with great propriety use all their income in reducing the principal of their debt, as indeed they do three fourths of it now to pay their interest account, and would really be increased in value to that amount; and yet, upon the theory of reported income being conclusive, it would escape taxation altogether. This view shows that what is called net income is only one of the elements to be considered upon the question of value. Its weight is controlled by other circumstances, which should always be made the subject of inquiry whenever the true valuation of the property is to be found. If, of the $201,000 claimed to represent the plaintiffs' net income for 1878, it should appear upon investigation that $50,000 ought, in good management, to have been laid out in current repairs, then, so far as net income is material in considering the question of value, it should be reckoned at $151,000 instead of $201,000; while, if only $100,000 was reported as net income, and it should appear that $50,000 had been expended for some purpose outside of the current business, then it is clear that the net income should be reckoned at $150,000, instead of $100,000.

Doe, C. J. The unconstitutionality of unequal taxation is too plainly declared by our constitution, and too well settled by repeated decisions made during the last fifty-three years, to be debatable. A disproportional, unequal assessment, so far as it is disproportional and unequal, is an act, not of taxation, but of confiscation, destitute of that element of equal rights which, under our constitution, is an essential part of the definition of law. "Equality is the corner-stone of every just and wholesome system of taxation. Every departure from this principle, no matter what the pretext may be, shifts upon one class a share of the burden of taxation that belongs to another." Rep. Tax Com'rs (1878), *p.* 10. There are difficult practical questions of application and detail. There may be differences of opinion as to which of those questions are judicial, and which are exclusively legislative. But there is no difference of opinion as to the general constitutional principle of equality. Mathematical equality of taxation being unattainable, an approximation, reasonably exact, as nearly proportional as possible in consideration of the difficulties of the subject, and sufficient for the practical purposes of substantial justice, is all that is required. Cooley Taxation, *c.* 6; Burroughs Taxation, *s.* 26.

The legislation of 1878 made the remedy for inequality in the taxation of railroad property the same as for inequality in the taxation of other property. Any person aggrieved by an assessment made by selectmen may apply to the court for an abatement, and on his appeal such order is made as justice requires. G. L., *c.* 57, *s.* 12. Any party aggrieved at the decision of the board of equalization may apply to the court for redress, and on the appeal such orders are made as justice may require. G. L., *c.* 61, *s.* 9. There is a uniformity of procedure conducive, and perhaps necessary, to

the operation of the principle of equality. On appeals from municipal and state assessors, the facts are found; upon the facts, the law is decided and reported; the assessments are equalized by a uniform rule; and the tax-payer, the legislature, and the public have convenient means of knowing what are the decisions of the separated questions of law and fact, and what defects call for alterations of the law. Under this system of procedure, we have both parties,—the tax-payer and the tax-payee,—availing themselves of the right to be heard; and the result is a thorough public investigation of all questions of law and fact. The proofs and arguments brought forward by each party contending for its rights throw a great light upon those questions, and give all a better understanding of the subject; and, in the light thus furnished, the court and the legislature have means of promoting the operation of the rule of equality.

In this case, the facts found by the board of referees are very different from those found by the board of equalization. Important evidence, laid before the former, and not laid before the latter, sustains the presumption that each board was right on the evidence on which it acted. There is nothing tending to show that, upon the same evidence, there would have been any difference in the conclusions of the two boards.

The questions of fact passed upon by the referees are those which the law would require them to decide if the plaintiffs' tax were a municipal tax of the towns in which the road is located; and their proceedings and conclusions, in their legal character, accord with the constitutional requirement of equality, and the rights of both parties as settled by reported decisions and uniform practice, in cases of town taxes. *Cocheco Company* v. *Strafford*, 51 N. H. 455, 475–482; *Manchester Mills* v. *Manchester*, 57 N. H. 309; *Manchester Mills* v. *Manchester*, 58 N. H. 38; *Edes* v. *Boardman*, 58 N. H. 580, 588. By the terms of the statute, the tax of every railroad is to be "as near as may be in proportion to the taxation of other property * * * in the several towns and cities in which such railroad is located." G. L., *c.* 62, *s.*\* 1. If this provision is applicable to this case, the facts found by the referees are all we need for making such an order as justice requires.

Taxation requires a uniform valuation and a uniform rate. The expenditures of some towns and counties being greater than those of others, taxes must be higher in some than in others. But the rule of uniformity is coextensive with the territory to which a tax applies, and prevents unjust discriminations. A state tax must be uniform throughout the state, a county tax throughout the county, a town tax throughout the town. 4 N. H. 568; *Bank* v. *Hines*, 3 Ohio 1; *Gilman* v. *Sheboygan*, 2 Black 510, 517; *Pine Grove* v. *Talcott*, 19 Wall. 666, 675; Cooley Con. Lim. 495; Bur. Tax.,

---

\* By *c.* 53. Laws of 1881, the tax is assessable in proportion to the taxation of other property throughout the state.

*s.* 51. If each railroad tax were a municipal tax, levied for the sole benefit of the towns in which the road is located, the statutory provision that such tax shall be, as near as may be, in proportion to the taxation of other property in those towns, would be a reënactment of the constitution, since, by the constitutional requirement of proportional taxation, a town tax must be proportional throughout the town. But if the railroad tax is a state tax, this statutory provision is in conflict with the constitution, since a state tax must be proportional throughout the state; and the question is, whether, under existing law, the tax of a railroad is a municipal tax, which must be proportional with the tax of other property in certain towns, or whether it is a state tax, which must be proportional with the tax of other property throughout the state; or whether it so partakes of the nature of both as to be in part proportional to other taxes in the towns in which the road is located, in part proportional to other taxes in the towns in which stockholders reside, and in part proportional as a state tax.

The assessment and collection of the tax by state officers do not necessarily make it a state tax in every sense and for all purposes. The character and situation of railway property are such that the legislature might be of opinion that equality of assessment, and simplicity and economy of assessment and collection, require municipal taxes of such property to be made by state officers. If they were assessed piecemeal by the assessors of numerous towns, the legal proceedings for making them proportional might be very expensive and harassing. If the whole tax of each railroad, assessed and collected by the state, were paid by the state as collector to the several towns in which the road is located in proportion to the value of the property of the corporation in those towns, it might be claimed that the tax would be a municipal tax in such a sense as to justify an assessment proportional to the valuations and rates of other property in those towns. The employment of state machinery for the assessment and collection is not decisive of the question whether the tax is state or municipal. The disposition made of the tax when collected is evidence bearing on that question.

The state pays one quarter of the tax of each railroad to the towns in which the road is located. The remaining three quarters are divided into two parts, one representing, by the rule of proportion, the stockholders residing in New Hampshire, and the other part representing the stockholders residing elsewhere. The former part is paid to the towns in which New Hampshire stockholders reside; the latter part is retained by the state. The money paid to towns is theirs. The money retained by the state is appropriated to the general use of the state. Judged by the disposition made of it, this is not wholly a state tax, nor wholly a town tax; but partly state, and partly municipal. One quarter of it goes to the towns in which the road is located; a part of the other

three quarters goes to the stockholders' towns; and the rest to the state.

With this distribution of the money, the tax could be regarded as a municipal tax of the railroad towns if all the stock of each road were necessarily owned in the towns in which the road is located, so that the whole tax would go to them. As this is an impracticable condition, and one not contemplated by the law, the statutory provision, that the tax of every railroad is to be as near as may be in proportion to the taxation of other property in the several towns in which the road is located, cannot be constitutionally applied. So much of the tax as does not go to the railroad towns is not a tax of those towns in any sense, or for any purpose, and cannot be assessed in proportion to their valuations and rates. The proportional rule requires the municipal taxation of a town to be uniform throughout that town, and state taxation to be uniform throughout the state. A state tax, and a municipal tax of stockholders' towns, jointly assessed in proportion to the valuations and rates of railroad towns, are an example of one form of disproportional taxation. A tax not assessed or collected by the railroad towns, and of which they receive but one quarter part, is not a municipal tax of those towns; and an increase of the fraction by including a part of the other three quarters (going to some of them as stockholders' towns) does not make the tax theirs. Whatever the true legal character of the tax may be, it is not entirely a municipal tax of the railroad towns; and as the facts found by the referees are only such as would be material if the tax were a tax of those towns, we have not the facts necessary for making such order as justice requires. The report must be recommitted for a finding of other facts.

The tax is either a state tax, or a tax of a triple character, partly state, partly municipal in respect to the railroad towns, and partly municipal in respect to the stockholders' towns. The referees will find the facts necessary to be known, if it is a state tax; and if either party contends that the assessment should be of a triple character corresponding to the distribution of the tax, the referees will find such facts as would be material in such an assessment. When the facts are found, the parties will have an opportunity to be heard on the question whether, for the purpose of assessment, the tax is a state tax, or of a triple character.

*Report recommitted.*

All concurred.