Merrimack
No. 97-001

CLAREMONT SCHOOL DISTRICT *& a.*

v.

GOVERNOR *& a.*

December 17, 1997

464

*Stein, Volinsky & Callaghan, P.A.*, of Concord (*Andru H. Volinsky & a.* on the briefs, and *Mr. Volinsky* orally), *John E. Tobin, Jr.*, of Concord, on the briefs and orally, and *McLane, Graf, Raulerson & Middleton*, of Manchester (*Wilbur A. Glahn, III* on the briefs), for the plaintiffs.

*Philip T. McLaughlin*, attorney general (*Leslie J. Ludtke*, associate attorney general, and *Patrick E. Donovan*, assistant attorney general, on the brief, and *Mr. McLaughlin* orally), for the State.

*Sheehan Phinney Bass + Green*, of Manchester (*Thomas J. Flygare* on the brief), for An Unnamed Unincorporated Association of Concerned New Hampshire Citizens, as *amicus curiae*.

*Theodore E. Comstock*, of Concord, and *James F. Allmendinger*, of Concord, on the brief, for Joint Education Council, as *amicus curiae*.

*Wiggin & Nourie, P.A.*, of Manchester (*L. Jonathan Ross* on the brief), for the New Hampshire Civil Liberties Union, as *amicus curiae*.

■ BROCK, C.J. In this appeal we hold that the present system of financing elementary and secondary public education in New Hampshire is unconstitutional. To hold otherwise would be to effectively conclude that it is reasonable, in discharging a State obligation, to tax property owners in one town or city as much as four times the amount taxed to others similarly situated in other towns or cities. This is precisely the kind of taxation and fiscal mischief from which the framers of our State Constitution took strong steps to protect our citizens. The procedural history of the case and the reasons for our decision follow.

This is the second appeal of this case. In 1991, the plaintiffs filed a petition for declaratory and injunctive relief challenging the method by which the State of New Hampshire provides and funds education to New Hampshire children and the disproportionality of the property taxes levied to pay for education. The plaintiffs are five school districts, five students, and eight taxpayers and parents. The petition was dismissed by the Trial Court (*Manias*, J.) for failure to state a claim upon which relief could be granted. In *Claremont School District v. Governor*, 138 N.H. 183, 635 A.2d 1375 (1993) (*Claremont I*), this court reversed, holding that it was the State's duty to provide a constitutionally adequate public education and to guarantee adequate funding, and remanded for a trial on the merits.

On remand, following a trial, the Trial Court (*Manias*, J.) ruled in a detailed and thoughtful opinion that: (1) the education provided in

the plaintiff school districts is constitutionally adequate; (2) the New Hampshire system of funding public elementary and secondary education guarantees constitutionally adequate funding to each of the plaintiff school districts; (3) the New Hampshire system of school funding does not violate the plaintiffs' right to equal protection under the State Constitution, part I, articles 1, 2 and 12; and (4) the system of school financing does not violate part II, article 5 of the State Constitution. We hold that the property tax levied to fund education is, by virtue of the State's duty to provide a constitutionally adequate public education, a State tax and as such is disproportionate and unreasonable in violation of part II, article 5 of the New Hampshire Constitution. Having so decided, we need not reach the plaintiffs' other claims. Accordingly, we reverse.

I

Funding for public education in New Hampshire comes from three sources. First, school districts are authorized to raise funds through real estate taxation. Locally raised real property taxes are the principal source of revenue for public schools, providing on average from seventy-four to eighty-nine percent of total school revenue. Second, funds are provided through direct legislative appropriations, primarily in the form of Foundation Aid, Building Aid, and Catastrophic Aid. Direct legislative appropriations account for an average of eight percent of the total dollars spent on public elementary and secondary education, ranking New Hampshire last in the United States in percentage of direct support to public education. Third, approximately three percent of support for the public schools is in the form of federal aid.

At the present time, the State places the responsibility for providing elementary and secondary public education on local school districts. State statutes, rules, and regulations delineate the requirements to be followed by school districts. *See* RSA 186:5 (1989) (State Board of Education has same powers over public schools as directors of corporation have over business); RSA 189:1-a (1989) (duty of school board to provide at district expense elementary and secondary education); RSA 194:1 *et seq.* (1989 & Supp. 1996) (general powers and duties of school districts); N.H. ADMIN. RULES, Ed 200 *et seq.* (1996). For example, school districts are required to provide standard schools for 180 days per year, RSA 189:1, :24 (1989); provide transportation, RSA 189:6 (Supp. 1996); provide meals to students, RSA 189:11-a (1989); purchase and provide textbooks, RSA 189:16 (1989); meet minimum standards for

school approval, RSA 186:8 (1989); provide special education services, RSA 186:6 (1989); and participate in the school improvement and assessment program, RSA ch. 193-C (Supp. 1996).

To comply with the State's requirements, school districts must raise money for their schools with revenue collected from real estate taxes. RSA 194:34 (1989); RSA 198:1-:7 (1989 & Supp. 1996). Every year, the selectmen of each town are required to assess an annual tax of $3.50 on each $1,000 of assessed value for the support of that district's schools. RSA 198:1. Each school district then details the sums of money needed to support its public schools and produces a budget that specifies the additional funds required to meet the State's minimum standards. A sum sufficient to meet the approved school budget must be assessed on the taxable real property in the district. RSA 197:1 (1989); RSA 198:5. The commissioner of revenue administration computes a property tax rate for school purposes in each district. Using the determined rate, city and town officials levy property taxes to provide the further sum necessary to meet the obligations of the school budget.

As the trial court noted in its order, the total value of the property subject to taxation for local school revenue varies among the cities and towns of New Hampshire.

> To some extent, the amount of revenue that a school district raises is dependent upon the value of the property in that district. This point can be illustrated by a comparison of petitioner district Franklin and its comparison district Gilford. In 1994, Franklin's "equalized property value" (property assessed at 100% of fair market value) per student was $183,626, while Gilford's equalized property value per student was $536,761. As a result, "property rich" Gilford had a significantly greater assessed value upon which taxes could be imposed for the support of its schools than did Franklin. Gilford raised more money per student than Franklin, even while taxing its residents at lower rates.

The plaintiffs argue that the school tax is a unique form of the property tax mandated by the State to pay for its duty to provide an adequate education and that the State controls the process and mechanism of taxation. Because of the purpose of the tax and the control exerted by the State, the plaintiffs contend that the school tax is a State tax that should be imposed at a uniform rate throughout the State. The State argues that "[b]ecause the school tax is a local tax determined by budgeting decisions made by the

district's legislative body and spent only in the district, it meets the constitutional requirement of proportionality." According to the State, "property taxation is a stable and expan[dable] source of revenue which allows the citizens of New Hampshire to decide how to organize and operate their schools in a manner which best meets the needs of their children." The question of whether property taxes for schools are local or State taxes is an issue of first impression.

Part II, article 5 of the State Constitution provides that the legislature may "impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and residents within, the said state." This article requires that "all taxes be proportionate and reasonable — that is, equal in valuation and uniform in rate." *Opinion of the Justices*, 117 N.H. 749, 755, 379 A.2d 782, 786 (1977) (citation omitted); *see Johnson & Porter Realty Co. v. Comm'r of Rev. Admin.*, 122 N.H. 696, 698, 448 A.2d 435, 436 (1982) (tax must be in proportion to actual value of property and must operate in reasonable manner). "[T]he test to determine whether a tax is equal and proportional is to inquire whether the taxpayers' property was valued at the same per cent of its true value as all the taxable property in the taxing district." *Bow v. Farrand*, 77 N.H. 451, 451-52, 92 A. 926, 926 (1915). "[T]he property shall be valued within a reasonable time before the tax is assessed." *Id.* at 452, 92 A. at 926.

In defining the taxing district, the trial court reasoned that whether a tax is a State tax or a local tax depends on "the entity that controls the mechanics of assessment and collection" and "the disposition of the tax revenues after their collection." The court found that each municipality controls the mechanics of assessment and collection of local property taxes, including the budgeting function and the determination of the local assessed value of property within each municipality. In addition, the court found that the property tax, once collected, is managed and expended by each municipality in accordance with its budget and thus does not become a part of the State treasury. The court concluded, therefore, that the school tax is a local tax and not a State tax. Because the trial court found there was no evidence that the school tax operated disproportionately within any local taxing district, it concluded that there was no violation of part II, article 5.

■ Determining the character of a tax as local or State requires an initial inquiry into its purpose.

In order . . . that the tax should be proportional . . . it is required that the rate shall be the same throughout the

taxing district; — that is, *if the tax is for the general purposes of the state, the rate should be the same throughout the state*; if for the county, it should be uniform throughout the county; — and the requisite of proportion, or equality and justice, can be answered in no other way.

*State v. Express Co.*, 60 N.H. 219, 243 (1880) (Stanley, J.) (emphasis added). We find the purpose of the school tax to be overwhelmingly a State purpose and dispositive of the issue of the character of the tax.

"[T]he local school district, an entity created by the legislature almost two centuries ago, exists for the public's benefit, to carry out the mandates of the State's education laws." *Opinion of the Attorney General*, No. 82-100-I (Sept. 8, 1982) (citation omitted). "Indeed, school district monies, a public trust, can only be spent in furtherance of these educational mandates, and to promote the values set forth in the 'Encouragement of Literature' clause, N.H. CONST., pt. 2, Art. 83." *Id.* As we held in *Claremont I*, "part II, article 83 imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding." *Claremont I*, 138 N.H. at 184, 635 A.2d at 1376.

■ Providing an adequate education is thus a duty of State government expressly created by the State's highest governing document, the State Constitution. In addition, public education differs from all other services of the State. No other governmental service plays such a seminal role in developing and maintaining a citizenry capable of furthering the economic, political, and social viability of the State. Only in part II, article 83 is it declared a duty of the legislature to "cherish" a service mandated by the State Constitution. *See Claremont I*, 138 N.H. at 187, 635 A.2d at 1378 (duty to cherish commands that State support all public schools). Furthermore, education is a State governmental service that is compulsory. *See* RSA 193:1 (Supp. 1996). That the State, through a complex statutory framework, has shifted most of the responsibility for supporting public schools to local school districts does not diminish the State purpose of the school tax. Although the taxes levied by local school districts are local in the sense that they are levied upon property within the district, the taxes are in fact State taxes that have been authorized by the legislature to fulfill the requirements of the New Hampshire Constitution. *See Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 220 n.1 (Ky. 1989) (Vance, J., dissenting); *Opinion of the Justices*, 88 N.H. 500, 508,

190 A. 801, 807 (1937) (distinguishing tax revenue to meet State needs from tax revenue for strictly local needs). "The taxes imposed by the legislature for the support of schools . . . are, in their nature, state taxes . . . ." *Opinion*, 4 N.H. 565, 571 (1829). Consequently, "[t]here is abundant justification in fact for taking this property out of the class taxed locally, and taxing it at the average rate throughout the state." *Opinion of the Justices*, 84 N.H. 559, 566, 149 A. 321, 325 (1930). For purposes of analysis under part II, article 5, therefore, the taxing district is the State.

The question then is whether the school tax as presently structured is proportional and reasonable throughout the State in accordance with the requirements of part II, article 5. Evidence introduced at trial established that the equalized tax rate for the 1994-1995 school year in Pittsfield was $25.26 per thousand while the rate in Moultonborough was $5.56 per thousand. The tax rate in Pittsfield, therefore, was more than four times, or over 400 percent, higher than in Moultonborough. Likewise, the equalized tax rate for the 1994-1995 school year in Allenstown was $26.47 per thousand while the rate in Rye was $6.86 per thousand — a difference in tax rates of almost 400 percent. We need look no further to hold that the school tax is disproportionate in violation of our State Constitution. Indeed, the trial court acknowledged that the plaintiffs "presented evidence that the school tax may be disproportionate if it is a state tax."

In addition, we conclude that the school tax as presently assessed is unreasonable. The word "reasonable" as used in part II, article 5 means "just." *Opinion*, 4 N.H. at 569. "[T]he sense of the clause [is], that taxes shall be laid, not merely proportionally, but in due proportion, so that each individual's just share, and no more, shall fall upon him." *Id.*

Because the diffusion of knowledge and learning is regarded by the State Constitution as "essential to the preservation of a free government," N.H. CONST. pt. II, art. 83, it is only just that those who enjoy such government should equally assist in contributing to its preservation. The residents of one municipality should not be compelled to bear greater burdens than are borne by others. In mandating that knowledge and learning be "generally diffused" and that the "opportunities and advantages of education" be spread through the various parts of the State, N.H. CONST. pt. II, art. 83, the framers of the New Hampshire Constitution could not have intended the current funding system with its wide disparities. This is likely the very reason that the people assigned the duty to support the schools to the State and not to the towns.

■ There is nothing fair or just about taxing a home or other real estate in one town at four times the rate that similar property is taxed in another town to fulfill the same purpose of meeting the State's educational duty. Compelling taxpayers from property-poor districts to pay higher tax rates and thereby contribute disproportionate sums to fund education is unreasonable. Children who live in poor and rich districts have the same right to a constitutionally adequate public education. Regardless of whether existing State educational standards meet the test for constitutional adequacy, the record demonstrates that a number of plaintiff communities are unable to meet existing standards despite assessing disproportionate and unreasonable taxes. "If modern conditions make ancient divisions or plans for distributing the tax burden inequitable, it would seem to be a plain legislative duty to enact such constitutional laws as will remedy the defect." *Opinion of the Justices*, 84 N.H. at 581, 149 A. at 332-33; *see State v. Express Co.*, 60 N.H. at 247 (Doe, C.J.) ("methods of dividing the public expense, equitable enough for practical purposes in the last century, would now be good cause of complaint"). We hold, therefore, that the varying property tax rates across the State violate part II, article 5 of the State Constitution in that such taxes, which support the public purpose of education, are unreasonable and disproportionate. To the extent that the property tax is used in the future to fund the provision of an adequate education, the tax must be administered in a manner that is equal in valuation and uniform in rate throughout the State.

## II

■ Following *Claremont I*, the trial court, in the absence of legislative action, accepted a definition of educational adequacy developed by the State Board of Education. This definition provides in part: "An adequate public elementary and secondary education in New Hampshire is one which provides each educable child with an opportunity to acquire the knowledge and learning necessary to participate intelligently in the American political, economic, and social systems of a free government." The definition then establishes at length a system of shared responsibility between State and local government. This definition, however, does not sufficiently reflect the letter or the spirit of the State Constitution's mandate. The constitution places the duty to support the public schools on "the legislators and magistrates." N.H. CONST. pt. II, art. 83. As we said in *Claremont I*, it is for the legislature and the Governor to "fulfill their responsibility with respect to defining the specifics of,

and the appropriate means to provide through public education, the knowledge and learning essential to the preservation of a free government." *Claremont I*, 138 N.H. at 193, 635 A.2d at 1381. Thus, in the first instance, it is the legislature's obligation, not that of individual members of the board of education, to establish educational standards that comply with constitutional requirements.

Our society places tremendous value on education. Education provides the key to individual opportunities for social and economic advancement and forms the foundation for our democratic institutions and our place in the global economy. The very existence of government was declared by the framers to depend upon the intelligence of its citizens. *See* N.H. CONST. pt. II, art. 83; *State v. Jackson*, 71 N.H. 552, 553-54, 53 A. 1021, 1022 (1902). As the New Hampshire Constitution exists today, education is deemed so essential to the viability of the State that part II, article 83 is one of only two places in the constitution where a duty is affirmatively placed on the legislature. *Compare* N.H. CONST. pt. II, art. 83 ("it shall be the duty of the legislators . . . to cherish . . . public schools") *with* N.H. CONST. pt. II, art. 5-A (legislature has "duty to provide for prompt and temporary succession to the powers and duties of public officers" in the event of enemy attack). "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954).

█ In this appeal, the plaintiffs ask us to declare a State funded constitutionally adequate public education a fundamental right. In response to the same request, the trial court ruled that "[c]lassification of a right as fundamental under the New Hampshire Constitution is a task which properly rests with our Supreme Court." When governmental action impinges fundamental rights, such matters are entitled to review under the standard of strict judicial scrutiny. In *Belkner v. Preston*, 115 N.H. 15, 18, 332 A.2d 168, 170-71 (1975), this court instructed that "[w]here either a 'suspect' classification (*i.e.*, race, alienage, nationality, and probably, sex) or a 'fundamental interest' (*i.e.*, procreation, interstate travel, voting, first amendment rights) is involved, state statutes are subjected to strict judicial scrutiny with the result that there must be a compelling state interest to sustain the legislation." We learn also from the writing of Chief Justice Doe a little more than one hundred years ago that

> [t]he settled constitutional right of equal privileges and equal protection under general law rests on incontestable

grounds of wisdom and necessity. The equal protection of the laws recently inserted in the federal constitution has been a New Hampshire doctrine 110 years; and it has been maintained here in a breadth of meaning and a scope of practical operation unknown elsewhere.

*State v. Griffin*, 86 N.H. 609, 615, 186 A. 923, 926 (1894) (Doe, C.J., *see* Reporter's Note).

In determining whether, in New Hampshire, a State funded constitutionally adequate elementary and secondary education is a fundamental right, we are guided by two salient factors: one of constitutional interpretation and the other of practicality and common sense. First and foremost is the fact that our State Constitution specifically charges the legislature with the duty to provide public education. *See* N.H. CONST. pt. II, art. 83. This fact alone is sufficient in our view to accord fundamental right status to the beneficiaries of the duty. *Claremont I*, 138 N.H. 183, 635 A.2d 1375.

It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is "fundamental" is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. . . . Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution.

*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 33-34 (1973).

■ Second, and of persuasive force, is the simple fact that even a minimalist view of educational adequacy recognizes the role of education in preparing citizens to participate in the exercise of voting and first amendment rights. The latter being recognized as fundamental, it is illogical to place the means to exercise those rights on less substantial constitutional footing than the rights themselves. We hold that in this State a constitutionally adequate public education is a fundamental right. In so doing we note that "[t]he right to an adequate education mandated by the constitution is not based on the exclusive needs of a particular individual, but rather is a right held by the public to enforce the State's duty." *Claremont I*, 138 N.H. at 192, 635 A.2d at 1381.

■ We emphasize that the fundamental right at issue is the right to a State funded constitutionally adequate public education. It is

not the right to horizontal resource replication from school to school and district to district. The substance of the right may be achieved in different schools possessing, for example, differing library resources, teacher-student ratios, computer software, as well as the myriad tools and techniques that may be employed by those in on-site control of the State's public elementary and secondary school systems. But when an individual school or school district offers something less than educational adequacy, the governmental action or lack of action that is the root cause of the disparity will be examined by a standard of strict judicial scrutiny.

"Given the complexities of our society today, the State's constitutional duty extends beyond mere reading, writing, and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas." *Claremont I*, 138 N.H. at 192, 635 A.2d at 1381. A constitutionally adequate public education is not a static concept removed from the demands of an evolving world. It is not the needs of the few but the critical requirements of the many that it must address. Mere competence in the basics — reading, writing, and arithmetic — is insufficient in the waning days of the twentieth century to insure that this State's public school students are fully integrated into the world around them. A broad exposure to the social, economic, scientific, technological, and political realities of today's society is essential for our students to compete, contribute, and flourish in the twenty-first century.

██ We look to the seven criteria articulated by the Supreme Court of Kentucky as establishing general, aspirational guidelines for defining educational adequacy. A constitutionally adequate public education should reflect consideration of the following:

(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields

so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.

*Rose v. Council for Better Educ., Inc.*, 790 S.W.2d at 212; *see McDuffy v. Sec'y of Exec. Off. of Educ.*, 615 N.E.2d 516, 554 (Mass. 1993). We view these guidelines as benchmarks of a constitutionally adequate public education. "These guidelines accord with our Constitution's emphasis on educating our children to become free citizens on whom the [State] may rely to meet its needs and to further its interests." *McDuffy*, 615 N.E.2d at 555. Without intending to intrude upon prerogatives of other branches of government, *see* N.H. CONST. pt. I, art. 37, we anticipate that they will promptly develop and adopt specific criteria implementing these guidelines and, in completing this task, will appeal to a broad constituency. "While the judiciary has the duty to construe and interpret the word 'education' by providing broad constitutional guidelines, the Legislature is obligated to give specific substantive content to the word and to the program it deems necessary to provide that 'education' within the broad guidelines." *Seattle Sch. Dist. No. 1 of King Cty. v. State*, 585 P.2d 71, 95 (Wash. 1978).

We agree with Justice Horton that we were not appointed to establish educational policy, nor to determine the proper way to finance its implementation. That is why we leave such matters, consistent with the Constitution, to the two co-equal branches of government and why we did so in the unanimous opinion of this court in *Claremont I*. We disagree with him that the taxation of property to support education must reach the level of confiscation before a constitutional threshold is crossed. It is our duty to uphold and implement the New Hampshire Constitution, and we have done so today.

## III

Our decision does not prevent the legislature from authorizing local school districts to dedicate additional resources to their schools or to develop educational programs beyond those required for a constitutionally adequate public education. We recognize that local control plays a valuable role in public education; however, the State cannot use local control as a justification for allowing the existence of educational services below the level of constitutional adequacy. The responsibility for ensuring the provision of an

adequate public education and an adequate level of resources for all students in New Hampshire lies with the State. "[W]hile local governments may be required, in part, to support public schools, it is the responsibility of the [State] to take such steps as may be required in each instance effectively to devise a plan and sources of funds sufficient to meet the constitutional mandate." *McDuffy*, 615 N.E.2d at 556; *see* RSA 198:1-:7. We agree with those who say that merely spending additional money on education will not necessarily insure its quality. It is basic, however, that in order to deliver a constitutionally adequate public education to all children, comparable funding must be assured in order that every school district will have the funds necessary to provide such education. Imposing dissimilar and unreasonable tax burdens on the school districts creates serious impediments to the State's constitutional charge to provide an adequate education for its public school students.

The State's duty to provide for an adequate education is constitutionally compelled. The present system selected and crafted by the State to fund public education is, however, unconstitutional. While the State may delegate its obligation to provide a constitutionally adequate public education to local school districts, it may not do so in a form underscored by unreasonable and inequitable tax burdens. As the State acknowledged at oral argument, several financing models could be fashioned to fund public education. It is for the legislature to select one that passes constitutional muster.

■■■ Decisions concerning the raising and disposition of public revenues are particularly a legislative function and the legislature has wide latitude in choosing the means by which public education is to be supported. *Opinion of the Justices*, 97 N.H. 546, 547, 81 A.2d 853, 854 (1951); *see Opinion of the Justices*, 112 N.H. 32, 287 A.2d 756 (1972). The legislature has numerous sources of expertise upon which it can draw in addressing educational financing and adequacy, including the experience of other States that have faced and resolved similar issues. Accordingly, we do not remand for consideration of remedies at this time, but instead stay all further proceedings until the end of the upcoming legislative session and further order of this court to permit the legislature to address the issues involved in this case. We are mindful of the fact that our decision holding the present system of financing public education unconstitutional raises issues concerning the interim viability of the existing tax system. Because the legislature must be given a reasonable time to effect an orderly transition to a new system, the present funding mechanism may remain in effect through the 1998

tax year. *Cf. Merrill v. Manchester*, 114 N.H. 722, 730, 332 A.2d 378, 384 (1974).

We are confident that the legislature and the Governor will act expeditiously to fulfill the State's duty to provide for a constitutionally adequate public education and to guarantee adequate funding in a manner that does not violate the State Constitution. *See Claremont I*, 138 N.H. at 193, 635 A.2d at 1381.

> *Reversed; proceedings stayed pending further order of the court.*

THAYER, J., did not sit; BATCHELDER, J., retired, sat by special assignment under RSA 490:3; HORTON, J., dissented; the others concurred.

HORTON, J., dissenting: I agree with the majority that a proper education, beyond the basics, should include "[a] broad exposure to the social, economic, scientific, technological, and political realities of today's society." I also agree that the current financing matrix for education is far from desirable, for many of the reasons expressed in the majority opinion. My problem is that I was not appointed to establish educational policy, nor to determine the proper way to finance the implementation of this policy. Those duties, in my opinion, reside with the representatives of the people, the Governor, the legislature, and the respective magistrates and legislative authorities in the respective school and taxing districts. My job is to determine whether the structures for providing and financing education, as selected by these direct representatives of the people, meet the mandates of our State Constitution. I should not involve myself in social engineering, no matter how worthy the cause, when the constitution and the decisions of those charged with the obligation of forming social policy are compatible. This is not to say that I infer an absence of regard in the decision of the majority for the proper role of this court. My colleagues simply have a different view of the express constitutional mandate. I write separately to explain to the students and taxpayers of this State why I am unable to effect needed reform.

We have held that our constitution invests in the legislature and the magistrates of this State the duty to provide a *constitutionally* adequate education and to *guarantee* the funding thereof. *Claremont School Dist. v. Governor*, 138 N.H. 183, 184, 635 A.2d 1375, 1376 (1993) (*Claremont I*). We also held that the implementation of this duty could be delegated. *Id.* at 191, 635 A.2d at 1381. The

majority holds today that the present system of taxation to provide funding to meet this constitutional duty violates part II, article 5 of the State Constitution, because it is not reasonable or proportional. The majority, quite properly, seeks to define the standard for the constitutional duty to provide an adequate education. I disagree with the majority's definition of the standard imposed by the constitution, *see* N.H. CONST. pt. II, art. 83, and further would hold that the delegation of the duty, and its incumbent financing obligation, is proper, and not violative of part II, article 5 of our constitution.

"Constitutional adequacy" is not "general adequacy." The former must be determined by a careful reading of our constitution. The latter may be important to the makers of policy, but it is clear that one man's adequacy is another's deficiency. Under our system of government, the elected representatives of the people must strike the balance. The constitutional provision material to this inquiry is part II, article 83, which states, in part:

> Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, being highly conducive to promote this end; it shall be the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of literature and the sciences, and all seminaries and public schools, to encourage private and public institutions, rewards, and immunities for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and natural history of the country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and economy, honesty and punctuality, sincerity, sobriety, and all social affections, and generous sentiments, among the people . . . .

N.H. CONST. pt. II, art. 83.

I read article 83 to have two parts, the "cherish" part and the "encourage" part. We have held that "cherish" is a mandate to support. *Claremont I*, 138 N.H. at 187, 635 A.2d at 1378. "Encourage" does not contain the same mandate. The same dictionary that drove our interpretation of "cherish," *id.*, defines "encourage" as "to animate, to incite to any thing; to give courage to, to sup[p]ort the spirits, to embolden; to raise confidence, to make confident." T.

SHERIDAN, A GENERAL DICTIONARY OF THE ENGLISH LAN-
GUAGE (London 1780). This is not a duty on the encourager, but a
charge to have positive effect on the encouragee. I would parse part
II, article 83 and limit my constitutional mandate inquiry to these
words:

> Knowledge and learning, generally diffused through a
> community, being essential to the preservation of a free
> government; and spreading the opportunities and advan-
> tages of education through the various parts of the country,
> being highly conducive to promote this end; it shall be the
> duty of the legislators and magistrates, in all future periods
> of this government, to cherish the interest of literature and
> the sciences, and all seminaries and public schools . . . .

N.H. CONST. pt. II, art. 83.

Taking this as the mandated duty and seeking the constitutional
scope of this duty, I search for the constitutional purpose. I find this
purpose in the language "the preservation of a free government."
The article says that "education through the various parts of the
country" is conducive to meet that end. Thus, my constitutional
standard for adequacy would be satisfied if the education provided
meets the minimum necessary to assure the preservation of a free
government.

This standard would also be the subject of some debate, but the
policy makers would have a standard mandated by the constitution.
It would certainly contain the elements of reading, writing, and
mathematics. It would also include exposure to history and the form
of our government. Beyond this, arguments can be made for other
elements. I would include in the constitutional standard the first
three elements of the Kentucky standard adopted by the majority,
but not necessarily the balance (mental and physical wellness, arts,
preparation for advanced education or vocations). *Rose v. Council
for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989). Although it is
hard to fault the well-crafted Kentucky standard, it is taken from a
constitution that vests in the "General Assembly" the duty to
"provide for an efficient system of common schools throughout the
state." KY. CONST. § 183. Such a constitutional provision invites an
imperative to adequacy in the general sense. It is not appropriate as
an answer to our constitutional mandate. In our analysis, we must
look to education in the constitutional sense and define the level and
type of education mandated by our constitution. It is the latter
mandate that I designate the constitutional "nut." It is this nut that

the legislature and magistrates of this State must provide and for which they must guarantee funding. It is conclusive from the factual findings below that this constitutional nut has been provided by the school districts, well within their respective resources.

Of course, the definitive holding of the majority on the unconstitutionality of the current educational finance matrix is that it violates part II, article 5 of our constitution. This article requires that all taxes levied in the State be proportional and reasonable. Although the scope of the duty may be material to the question of reasonability, the issue of proportionality, in this case, is driven by a determination of the appropriate taxing district. If the taxing district is appropriate, it is clear that proportionality is determined within that taxing district. *Keene v. Roxbury*, 81 N.H. 332, 337, 126 A. 7, 10 (1924); *State v. Express Co.*, 60 N.H. 219, 243 (1880) (Stanley, J.); *Railroad v. The State*, 60 N.H. 87, 97 (1880). The majority, equating "duty" with "purpose," and ignoring the fact that governmental duty can be delegated to its subdivisions, holds that since the duty resides with the State, the State is the appropriate taxing district within which to measure proportionality. I would move from an analysis of duty to an analysis of purpose, and hold that the purpose in education taxation is a local purpose, the education of children of the school district. *Holt v. Antrim*, 64 N.H. 284, 286, 9 A. 389, 389 (1886) ("Local education is a local purpose for which legislative power may be delegated to towns.").

The State delegates many of its constitutional duties to its political subdivisions and provides for taxation to support satisfaction of the delegated duties at the local level. *See generally Wooster v. Plymouth*, 62 N.H. 193 (1882). It is important to understand that the State holds the residue of all political power and has been charged with all duties of government. N.H. CONST. pt. I, art. 7; U.S. CONST. amend. X. The State is the seminal unit for all aspects of government: the delivery of services, the protection of rights, and the determination of taxation for support. The State has the power to delegate these functions of government. It did so in binding delegation to the United States of America, in congress assembled, with its ratification of the Constitution of the United States. It does so, from time to time, by the formation of, and delegation of powers and duties to, its political subdivisions. The general duties of the State, imposed by our constitution, include provision of the general good (pt. I, art. 1), protection of the people (pt. I, arts. 3, 12), provision for the general benefit and welfare (pt. II, art. 5), and provision for government and ordering (pt. II, art. 5). Our constitution further imposes more specific duties, such as the provision of

a constitutionally adequate education and a guarantee of adequate funding (pt. II, art. 83; *Claremont I*, 138 N.H. at 184, 635 A.2d at 1376), provision of courts and legal remedies (pt. I, art. 14; pt. II, art. 4), provision for elections (pt. II, art. 5), and provision for the raising of taxes (pt. II, art. 5).

Since the counties, towns, cities, and districts of this State do not hold the ultimate sovereign power and are not vested with the duties of government by the constitution agreed to by our people, these political subdivisions have no constitutional powers or duties in their own right. They have no independent constitutional duty to govern and order, to protect, or to provide for the benefit and welfare. Yet, their role is immense, and arises through delegation. Many State duties have been delegated to its political subdivisions, and with this delegation has gone the responsibility to fund. *Wooster*, 62 N.H. at 216-17. *But cf.* N.H. CONST. pt. I, art. 28-a (no new or expanded unfunded mandates after enactment). Political subdivisions, at their own expense, carry out State duties on elections, fire and police protection, land use control and other exercises of the police power, provisions of highways, sanitation, and the structure and staffing of local government. For much of our history, the counties, towns, and cities provided, at their expense, the facilities, and some level of staffing, for our court system. The local school district, for some time, has financed the education for the children of the district.

Under my determination of duty and delegation, I am driven to a holding that the constitutional education nut is properly delegated and the purpose, for taxation purposes, is demonstrably local. *Holt*, 64 N.H. at 286, 9 A. at 389. Funds raised by taxation are used for political purposes within the district, for the district's use, and expended by the district to achieve educational standards set by the State and the district, for the sole benefit of the district. *See School-District v. Prentiss*, 66 N.H. 145, 146, 19 A. 1090, 1090 (1889); *cf. Allen v. Bidwell*, 68 N.H. 245, 246, 44 A. 295, 295 (1894); *Railroad v. The State*, 60 N.H. at 96. Given the legislature's proper delegation, its clear designation of the taxing district, the discerned purpose of the tax, and its obvious proportionality within the taxing district, I would hold that the trial court was correct in deciding, in the context of this case, that the part II, article 5 tests of reasonability and proportionality have been met by the current tax system.

The majority gives a passing nod to reasonability, equating it with proportionality. Obviously, these are two different tests since they are separately stated in part II, article 5. Reasonability can involve

a number of issues, but not proportionality. Reasonability should be measured against an absolute standard, whereas proportionality involves relative considerations. In this case, I would surmise that reasonability would involve measuring the tax collected against the property assessed, and where the taxing act becomes a taking act, the tax is unreasonable. *Cf. Acker v. Commissioner of Internal Revenue*, 258 F.2d 568, 574 (6th Cir. 1958), *aff'd*, 361 U.S. 87 (1959).

And that is the trigger of the State's guarantee which is mandated in the constitution, as interpreted in *Claremont I*. Failure of the school districts, the primary obligors, to provide funding for the educational nut by virtue of the unreasonability of their respective taxes, measured against the total local tax burden, would trigger the State's guarantee obligation. At that point, the State must step in and provide funding, or such part thereof as will reduce the tax burden to a reasonable level. The test of absolute reasonability is not developed in this case.

Although not the basis of the majority's opinion, the majority presents a learned analysis of the right of the student to education. It finds the right to be fundamental. I do not quarrel with this characterization, but note that its materiality is based on the plaintiffs' claim of a violation of equal protection. The majority does not find such a violation. Based on my definition of the constitutional duty owed to these students, I would hold that the record below demonstrates that the constitutional nut is provided to all students and find the funding scheme is not constitutionally infirm. Thus, there is no equal protection violation.

Although I have some quarrels with aspects of the decision below, none are the subject of this appeal, and I agree for the most part with the result reached by the trial court in a mostly excellent opinion.

Accordingly, I respectfully dissent and would affirm the decision below.